UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-11959-RWZ

VINTAGE ROCKLAND REALTY TRUST

v.

SMITHS MEDICAL ASD, INC.

MEMORANDUM OF DECISION

February 14, 2018

ZOBEL, S.D.J.

Massachusetts plaintiff Vintage Rockland Realty Trust brings the instant action in diversity against its former tenant, Minnesota defendant Smiths Medical ASD, Inc. The commercial lease agreement between the parties dates to May 2005, and was extended four times before expiring in April 2016. See Docket # 40-5 (Lease and amendments, hereafter "Lease"). Vintage sold the property to a third-party buyer in October 2016 for $3.7 million, see Docket # 43 (Consolidated Statement of Material Facts, hereafter "SOF"), at ¶¶ 16–17, but was dissatisfied with the condition in which Smiths left the property when it vacated. It claims injury in two areas[1] — unauthorized interior alterations and a damaged parking lot— under four causes of action: breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); violations of Massachusetts General Laws chapter 93A, §§ 2 and 11 (Count III); and

---

[1] The complaint also claims damages as to glass replacement for clouded windows, but the parties agreed at the motion hearing on November 9, 2017, to settle that claim.

negligence (Count IV).  Before me is defendant's motion for summary judgment on all counts.

## I. Factual Background

I summarize the relevant facts in the light most favorable to plaintiff, the non-moving party.  See Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 172 (1st Cir. 2015).

Plaintiff is a trust that had been organized for the purpose of owning the subject property.  It has three trustees, but is operated by one, Joseph Gallo.  Id.  Defendant leased the property, 45,580 square footage located at 160 Weymouth Street in Rockland, Massachusetts ("the Property"), for use in its manufacture of medical devices.  At the time of the original lease, the Property was a mix of office and warehouse space.

### A. Alterations

At all times during defendant's tenancy, the Lease prohibited defendant from making structural changes and from making non-structural changes without plaintiff's written consent.  It also required defendant to "maintain the leased premises in good condition, reasonable wear and tear, damage by fire and other casualty only excepted . . .The LESSEE shall not permit the leased premises to be overloaded, damaged, stripped, or defaced, nor suffer any waste." Lease at 4, ¶ 11A, as amended by paragraph 3 of Addendum A, id. at 8.

It is undisputed that defendant nonetheless made significant alterations to the Property during the course of its tenancy and has produced no evidence of consent for those alterations.  See Docket # 54-1, at ¶¶ 45–48, 50.  Building permits filed with the

2

Town of Rockland and identifying Smiths as the client include plans for new structural walls and ceilings, the addition of lab and sprinkler equipment, the removal of existing rooms, and the installation of rooftop HVAC equipment. Asked to anticipate the cost of putting the Property "back into a state ready to hand over to the land lord," defendant's site coordinator Dennis Sullivan observed, "There has been much work done to the facility over the years in regards to walls being put up and taken down, electrical additions, and the entire second floor being redone." Docket # 50, at 6–7 (email response, dated February 18, 2015, to defendant's "Director of Operations Transformation") ; see id. at 5 (notes of defendant's in-house counsel Shoua Xiong, dated January 22, 2015, describing "significant alterations" to Rockland facility); see also Docket # 40-3, at 22. The parties agree that these alterations occurred during the effective period of the Lease but disagree as to whether written consent was required.

As the expiration of the Lease approached, Gallo made multiple attempts to address the alterations with Smiths. See Docket # 50, at 8–9 (July 22, 2015 email from Gallo to defendant stating, "there is also the question of returning the building to it's [sic] original state. we [sic] need to discuss this as well."); Docket # 51, at 14 (August 11, 2015 email from Gallo to Xiong stating, "I do need to speak to Dennis [Sullivan] in regards to returning the condition of the property to its original status and repairs of the windows, which need attention asap."). Defendant initially appeared amenable, see, e.g., Docket # 50, at 8 (July 23, 2015 email from Xiong to Gallo responding, "With respect to returning the building to its original state, we'd greatly appreciate it if you could do a walk-through of the building with Ricco [Feudo, Facilities Supervisor] sometime next week and identify any modifications you'd like us to make so that we can

3

get the work underway as soon as possible."), but ultimately disavowed responsibility under the Lease. Docket # 51, at 23.

### B. The Parking Lot

In addition to the unauthorized alterations, plaintiff complains of the condition in which defendant left the Property's parking lot. The parties agree that the parking lot had not been replaced since its 1985 installation and sustained extensive damage during the historic snowfall of 2013–2014. Defendant had asked in 2013 that the lot be resurfaced, and plaintiff included in the final Lease addendum a provision that it would finance the resurfacing if defendant renewed the Lease. The Lease required defendant to perform maintenance and repairs but ascribed responsibility for capital expenditures other than those expressly included in the Lease to plaintiff. Although the parties now disagree as to whether the lot resurfacing resulted from defendant's failure of maintenance or was appropriately plaintiff's capital expenditure, neither ultimately bore the cost, as described below.

### C. Sale of the Property to Third-Party Buyer

When it became apparent that defendant would not renew the Lease, plaintiff engaged the brokerage services of James Rader, as owner of Rader Properties, to secure a new tenant. Although Rader identified prospective tenants, none were interested in leasing the Property in its present condition, and plaintiff concluded that the cost of restoration was prohibitive. Plaintiff ultimately negotiated a sale with a Rader-owned entity called 160 Weymouth LLC ("Buyer").

The Addendum to the Purchase and Sale Agreement dated August 4, 2016, includes the following language:

> 55. <u>Acknowledgment of Purchase Price Adjustment.</u> Buyer and Seller agree that the purchase price of the premises has been adjusted to

> reflect an estimated repair or replacement cost of the parking lot in the amount of $200,000.00 and demolition of existing leasehold improvements in the amount of $200,000.00. $3,700,000.00 is the agreed upon sale price.

The Offer to Purchase similarly quantifies the Purchase Price as below:

> Purchase Price:     $4,100,000    Gross Purchase Price
>                            ($200,000)     Deduct parking lot replacement
>                            ($200,000)     Deduct deferred maintenance & demo expenses
>                             $3,700,000     Net Purchase Price to be paid by Buyer all cash at closing. In no event shall Buyer be obligated to pay more than the Net Purchase Price.

After closing on the Property in October 2016, Buyer spent about $140,000 to resurface the parking lot. Buyer also spent about $25,000 on demolition work, and anticipates that additional demolition will be necessary to render rentable the one-third of the Property that remains vacant.

While the sale of the Property was still pending, plaintiff brought this action in state court, alleging essentially that defendant's breaches of the Lease resulted in damages and/or diminished the value of the Property. Defendant removed the case to federal court on September 29, 2016, and now moves for summary judgment on all counts.

## II. Legal Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st Cir. 2004) (quoting Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)). In determining whether a genuine issue of material fact exists, "a court must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S.

Ct. 1861, 1866 (2014) (per curiam) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

## III. Analysis

### A. Measure of Damages

It is axiomatic in a breach of contract case like this one that the injured party is limited to damages based on its actual loss caused by the breach. Restatement (Second) of Contracts § 347 (1981). See Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (quoting John Hetherington & Sons, Ltd. v. William Firth Co., 95 N.E. 961, 964 (Mass. 1911) ("The fundamental principle of law upon which damages for breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts.")).[2]

"It is clear that the standard for measuring damage to realty in Massachusetts is diminution in market value or the cost of curing the injury, whichever is less." In re Malden Mills Indus., Inc., 303 B.R. 688, 699 (B.A.P. 1st Cir. 2004). "If the injury to real property is permanent, the measure of damages is the difference in the fair market value of the injured premises before and after the injury. If the injury is reasonably curable by repairs, the expense of repairs, if less than the diminished market value, is the measure of recovery. However, Massachusetts courts have not expressly defined the concept of permanent injury to realty. As a result, most courts applying the diminution in fair market value test use repair costs as either the

---

[2] Since both parties assume Massachusetts law applies in this diversity case, that will be the governing law. See Magarian v. Hawkins, 321 F.3d 235, 238 n.4 (1st Cir. 2003) ("While a federal court sitting in diversity must apply the forum state's choice-of-law rules, . . . the court may accept the parties' agreement as to the choice of law without independent analysis of the governing rules." (citations omitted)).

6

measure of damages or as evidence of the extent of the diminution." (citations omitted). Id. at 698. I construe the injury as permanent where, as here, a sale has been effected, and accordingly weigh repair costs only insofar as they demonstrate diminution in value.

Although cost of repairs may be used as evidence of the extent of diminution in value, "[w]here the facts indicate that cost of repairs is unrelated to lessors' actual damage, the rule is not applied." Bowes v. Saks & Co., 397 F.2d 113, 116 (7th Cir. 1968) (citation omitted); see Hopkins v. American Pneumatic Service Co., 80 N.E.2d 624 (Mass. 1907) ("The cost of restoration of the property to its former condition does not necessarily furnish a true criterion for determining damages.").

Where diminution in value is the measure of damages, real estate experts may establish fair market value by a variety of methods. Mass. Port Auth. v. Sciaba Const. Corp., 766 N.E.2d 118, 124 n.5 (Mass. App. Ct. 2002). "Even though in some circumstances a court may permit an owner to testify as to his or her property's value, the scope of that proof is far more limited than that which would come from a qualified expert such as an appraiser. Even when an owner testifies about value of the owner's property, the testimony must be based on more than surmise, speculation and general impressions; the testimony must come from an owner particularly familiar with the property to testify as to its value with helpful factual specificity." Sullivan v. Leonard, No. 295802 (GHP), 2007 WL 2916464, at *5 (Mass. Land Ct. Oct. 9, 2007).

**B.    Breach of Contract (Count I)**

The parties agreed at the motion hearing on November 9, 2017, that because the property has sold, diminution in value is the appropriate measure of damages, but they part ways as to evidence thereof. In support of its argument that it would have achieved a higher purchase price for the property had defendant not breached, plaintiff points to three main pieces of evidence: (1) the estimated cost of repairs, citing to bids for the interior restoration and parking lot resurfacing, see Docket # 41,

7

at 18; Docket # 53; (2) buyer's opinion that the condition of the parking lot and interior build-outs hampered efforts to market the Property and reduced the final purchase price, see Docket # 41, at 19; Docket # 40-8, at 28:1–7, 61:3–62:11; and (3) Gallo's testimony that he reduced the price of the Property by $400,000, his estimate of the cost of repairs. Id. at 20; Docket # 52, ¶¶ 18–19.

Defendant maintains that plaintiff's claims must fail because plaintiff sold the Property for $3.7 million without incurring any restoration costs, and has thus sustained no damages. Docket # 39, at 11. Pointing to its expert appraisal of the property at $3.4 million at the time it vacated in July 2015, defendant contends that plaintiff has created no genuine issue of fact that it suffered harm as a result of any breach. See id.; see also SOF ¶ 34.

I consider in turn each of plaintiff's pieces of evidence beginning with the bids submitted estimating the cost of repairs. Plaintiff cites both to the bid of Tarbox Construction and to that of the property management company hired by defendant for the period after it vacated but before the expiration of the Lease. As to the former, Tarbox estimated that the interior restoration would cost $369,150, exclusive of parking lot resurfacing estimated at an additional $202,190. Defendant's property management company estimated $116,828.99 for the interior restoration, and an additional $175,000 for the parking lot.[3] Plaintiff has introduced no evidence, however, illustrating the relationship between the cost of repairs and the Property's value. As other courts have noted, "[t]his relationship (if any) is shaky indeed. Restoring property to its pre-injury condition may eliminate the depreciation in its fair market value which results from the injury. It by no means follows, however, that the cost of repairing the property will coincide with the amount of depreciation caused by the injury." Williams-Bowman Rubber Co. v. Indus. Maint., Welding and Mach. Co.,

---

[3] Defendant denies having solicited this bid and expressed frustration that its property manager appeared to be acting at plaintiff's behest.

Inc., 677 F. Supp. 539, 543 (N.D. Ill. 1987); see Trinity Church v. John Hancock Mut. Life Ins. Co., 502 N.E.2d 532, 536 (Mass. 1987) ("Not only must the cost of replacement or reconstruction be reasonable, the replacement or reconstruction itself must be reasonably necessary in light of the damage inflicted by a particular defendant."); see also Bowes, 397 F.2d at 117 (barring recovery of restoration costs for lessors who sold property without showing that lessee's conduct caused any diminution).

In the analogous Bowes case, plaintiff lessors rented several floors of a Chicago building to defendant retailer lessee Saks. Id. at 115. Saks also occupied an adjacent building across an alley from plaintiffs' building, and had constructed a pedestrian bridge between the two. Id. It was required under the lease to remove the bridge and restore doors and wall partitions before the expiration of the lease, but defendant failed to do so. Id. Plaintiffs nonetheless sold the building, incurred no restoration costs, and made no showing that defendant's breach reduced the purchase price. Id. at 117. Relying on the "fundamental rule that contract damages are supposed to compensate a loss and not provide a windfall," the court held that damages for lessee's failure to perform a restoration of no value to lessors could not be recovered. Id. at 119. See 349 W. Ontario Bldg. Corp. v. Palmer Truck Leasing Co., 317 N.E.2d 740, 748 (Ill. App. Ct.1974) (broker's testimony that due to condition of the building it was worth $60,000 less than it would have been in good repair described only a general condition, not the diminution in value which resulted from sublessees' breach). The same analysis applies here.

Plaintiff maintains, however, that the buyer's testimony that he or prospective tenants would have paid more for better maintained property is probative of diminution in value. Asked whether defendant's interior build-out and conversion to lab and office space adversely impacted the marketability of the Property, the buyer— who had also served as plaintiff's broker— responded, "Most tenants don't have a

9

vision of what it could look like . . . So I would say for most tenants though, the envisioning what it could look like, it was a challenge with all of the rooms and office build-out in the warehouse. Most of the tenants that came looking at the building were looking for warehouse, not office space." Docket # 40-8, at 60–62. He believed that the condition of the parking lot also had an adverse impact, and ultimately spent $140,000 to have it resurfaced.

But plaintiff confronts the same causation problem with the buyer's testimony as with evidence on cost of repairs above. The buyer's testimony does not amount to evidence that the purchase price was diminished, and the plaintiff thus harmed, by defendant's purported breach. Rather, buyer states that the $3.7 million purchase price reflected no reduction negotiated due either to interior alterations or to the parking lot. See id. at 9–12 ("Q. When you acquired the property for 3.7 million dollars you weren't getting a discount because of, for example, parking lot replacement or demolition of existing leasehold improvements; is that correct? . . . A. Correct, correct."). In contrast, buyer did specifically request a purchase price credit for failing HVAC units whose repair he anticipated would cost about $7,500. Id. at 36. Cf. 349 W. Ontario Bldg. Corp., 317 N.E.2d at 748 (that buyer considered building's condition when making purchase offer is insufficient to establish that sublessee's breach reduced the sale price by a specific dollar amount).

Finally, plaintiff highlights the price adjustment at paragraph 55 of the Addendum to the Purchase and Sale Agreement as evidence that it was forced to accept $400,000 less than the Property could have commanded, had defendant's interior alterations and neglect of the parking lot not diminished the value. Gallo concedes having included the price adjustment paragraph for the purposes of this lawsuit. And although he contends that the original asking price for the Property was $4.2 million, plaintiff offers neither a listing corroborating that fact nor a market analysis supporting that value. Buyer's subsequent ability to obtain a $4.6 million

10

mortgage on the Property, has no bearing on its fair market value at the time of sale, and even less on what the fair market value would have been absent any purported breaches. Gallo's statement that the Property was sold "on a distress basis and at a price which I do not believe reflected the true value of the property," Docket # 52, at ¶ 18, is insufficient to create a dispute of fact as to diminution in value. See Correia v. New Bedford Redev. Auth., 377 N.E. 2d 909, 913 (Mass. 1978) (analyzing testimony of real estate experts on multiple approaches to the issue of fair market value); see also Sullivan, No. 295802 (GHP), 2007 WL 2916464, at *5.

At bottom, plaintiff has not shown that the Property would have been more valuable absent the alterations merely because they would have cost money to remove. The record is undeveloped as to what about the Property's "as-is" condition deterred prospective tenants, and as to what actual damage plaintiff thereby incurred. Plaintiff points to no otherwise comparable properties commanding a higher sale price for want of such alterations and has submitted no expert report to refute defendant's appraisal. Because plaintiff has thus adduced no evidence of damages which a reasonable jury could attribute to defendant, defendant is entitled to summary judgment on Count I.

### C. Additional Claims (Counts II, III, and IV)

Plaintiff further alleges breach of the covenant of good faith and fair dealing (Count II), violations of Massachusetts General Laws chapter 93A (Count III), and negligence (Count IV). Because each ancillary claim contains a damages predicate, however, none can survive summary judgment. See, e.g., Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005) ("The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives. The scope of the covenant is only as broad as the contract that governs the particular relationship."); Walsh v. TelTech Sys., Inc., 821 F.3d 155, 159 (1st Cir. 2016) ("Under Chapter 93A, an act or practice is unfair if it

falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers'" or competitors) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 918 (Mass. 1975)); Jupin v. Kask, 849 N.E.2d 829, 834–35 (Mass. 2006) ("To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage.").

## IV. Conclusion

_____The defendant's Motion for Summary Judgment (Docket # 38) is ALLOWED on all counts.

_____February 14, 2018 _____          _____/s/Rya W. Zobel_____
     DATE                   RYA W. ZOBEL
                      SENIOR UNITED STATE DISTRICT JUDGE